IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Case No: 1:21-CV-00714

| | |
|---|---|
| Arthur Hill, | ) |
| | ) |
| Plaintiff *pro se*, | ) |
| | ) |
| | )     **SECOND AMENDED COMPLAINT** |
| v. | ) |
| | ) |
| Carvana, LLC and | ) |
| Experian Information Solutions, Inc. | ) |
| | ) |
| Defendants. | ) |

Plaintiff Arthur Hill ("Plaintiff" or "Hill"), pursuant to F.R.C.P 15(a)(2) and 15(c), submits

his Second Amended Complaint and complains of the Defendants Carvana, LLC ("Carvana") and

Experian Information Solutions, Inc. ("Experian") for violations the Fair Credit Reporting Act

("FCRA") and/or state law stating the following:

## PARTIES

1.    Plaintiff is a natural person and at all times relevant to this complaint here was a resident

of Cabarrus County in North Carolina.  Plaintiff is a "person" and "consumer" as those terms are

defined pursuant to 15 U.S.C. § 1681a(b) and (c) respectively.

2.    Carvana is a used car dealership that conducts business in or affecting commerce and

does so exclusively via the internet at carvana.com with its principal place of business located at

1930 W. Rio Salado Pkwy Tempe, AZ 85281.  Carvana is a "person" as defined pursuant to 15

U.S.C. § 1681a(b).

3.    Carvana may be serviced with process by delivering a copy of the summons and

complaint to their registered agent, Corporation Service Company, at 2626 Glenwood Avenue

Suite 550. Raleigh, NC 27608.

1

4.     Experian is a "consumer reporting agency" as defined pursuant to 15 U.S.C. § 1681a(f) with its principal place of business in California. Experian collects and compiles data which is used or expected to be used for specifically enumerated transactions in Section 1681a(d) or Section 1681b(3)(A)-(E).

5.     Experian may be serviced with process by delivering a copy of the summons and complaint to their registered agent at 160 Mine Lake Ct Ste 200, Raleigh, NC 27615-6417.

## JURISDICTION AND VENUE

6.     Jurisdiction and venue of this court is proper pursuant to 15 U.S.C. § 1681p and 28 U.S.C. §§ 1331.

7.     This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. § 1367.

8.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) and (c), as the Plaintiff resides within the District, a substantial portion of the events or omissions giving rise to the claim occurred in this District, and Carvana maintains an agent and regularly conducts business in this District.

## FCRA STATUTORY BACKGROUND

9.     The FCRA is a consumer protection statute which regulates the activities of credit reporting agencies and users of credit reports, and which provides certain rights to consumers affected by use of the collected information about them.

10.     Congress designed the FCRA to preserve the consumer's right to privacy by safeguarding the confidentiality of the information maintained by the consumer reporting agencies. Congress stated in the opening section of the FCRA that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for

Case 1:21-cv-00714-CCE-LPA   Document 27-1   Filed 11/03/21   Page 2 of 49

the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

11.     Under the FCRA, the term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in the underwriting of credit transactions involving the consumer.

12.     Congress has chosen to protect the consumer's right to privacy by prohibiting any release of consumer reports unless the release is for one of the permissible purposes listed in 15 U.S.C. § 1681b. 15 U.S.C. § 1681b(f) in turn provides "[a] person shall not use or obtain a consumer report for any purpose unless – (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section." The permissible purposes listed in 1681b usually arise only in connection with transactions initiated by the consumer. *See* 15 U.S.C. § 1681b(a)(3)(A)(F).

13.     Congress has also chosen to help consumer's protect their right to privacy by requiring that a consumer reporting agent, upon request, provide all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored. *See* 15 U.S.C. § 1681g.

## STATEMENT OF FACTS

14.     On or around August 15, 2019, the Plaintiff purchased a 2016 BMW 328i ("BMW 3") from Carvana and the BMW 3 was delivered to the Plaintiff at Carvana's South Blvd location in Charlotte North Carolina on August 17, 2019. Plaintiff financed the loan through Carvana. Bridgecrest Credit Company, LLC ("Bridgecrest") is the servicer of the installment contract

3

("Contract") and Plaintiff's payments under the Contract were due to Bridgecrest and payments due have been paid in full as of September 22, 2021. Bridgecrest is also a "furnisher" as defined under the FCRA.

15.    Plaintiff registered at bridgecrest.com where he signed up for autopay and where he could also contact Bridgecrest or make changes to his home address, telephone number and email address if necessary. On information and belief, Bridgecrest is listed as the lienholder on the BMW 3 title. All communications sent to Plaintiff from Bridgecrest included a legal disclosure that stated: *"Legal disclosure: This is an attempt to collect a debt. Any information received will be used for that purpose. If you filed for bankruptcy protection, please disregard any reference to debt collection. This email is for informational purposes only."*.

16.    To begin the purchase of the BMW 3 purchase, Plaintiff found the vehicle online at carvana.com, clicked the vehicle and then clicked "Get Started" button located to the right of the vehicle details. Since Plaintiff did not have an online account profile, he was directed to a page to create a carvana.com account profile by supplying his name, phone number, email address, zip code and password to create the account. Plaintiff was then directed to the page to start the purchase where he selected the option to finance through Carvana.

17.    During the purchase process, Carvana places a temporary hold on the vehicle to prevent other users from starting a purchase of the same vehicle and a status of "Purchase In Progress" usually appears in search results for other users. And if a purchase is not completed within an alotted amount of time, a) the temporary hold on that vehicle expires, b) it is made available for purchase by others and c) the user who started the purchase is notified via email with the subject containing "Your Hold Has Expired".

18.    Prior to finalizing and completing a purchase of the BMW 3 online, Carvana provides

4

a "Get My Financing Terms" button which performs a soft pull against Plaintiff's credit file to determine what the finance terms would be and present them online. Finally, after completing and electronically signing all documents for the purchase and scheduling delivery, Carvana performs a hard credit pull. The signed documents were provided to the Plaintiff at the pickup location in Charlotte.

19. Plaintiff received 2 emails from Carvana during the BMW 3 purchase process. After uploading a copy of his drivers license and completing and/or electronically signing purchase related documents online, which included a sales contract and an arbitration agreement ("written arbitration agreement"), the delivery of the BMW 3 was scheduled for pickup on August 17, 2019.

20. On August 21, 2019, Plaintiff opted out of the written arbitration agreement with Carvana by sending his name, address, and vehicle identification number to arbitrationoptout@carvana.com which was required within thirty (30) days of the purchase of the BMW 3. Plaintiff's claims related to Carvana are not subject to arbitration as a result.

21. Prior to opting out of the arbitration agreement, while reviewing the documents Plaintiff was provided on the day of pickup, he observed that Carvana changed the date on the Retail Installment Contract and Sales Agreement to August 17, 2019 even though the Plaintiff electronically signed those agreements on August 15, 2019. And although the Plaintiff consummated the agreements on August 15, 2019, Carvana sent Plaintiff a separate email with a link to a risk-based pricing notice ("RISK NOTICE 1") on August 17, 2019, the day Plaintiff was scheduled to pickup the BMW 3. And again, even though the Plaintiff consummated the agreements on August 15, 2019 and picked up the vehicle on August 17, 2019, Carvana sent Plaintiff another separate email with a link to a risk-based pricing notice ("RISK NOTICE 2") on August 19, 2019.

5

22.	After researching what the risk-based pricing notices were, Plaintiff learned that the risk-based pricing notice was not provided in a timely manner. "In the case of a grant, extension, or other provision of closed-end credit, before consummation of the transaction, but not earlier than the time the decision to approve an application for, or a grant, extension, or other provision of, credit, is communicated to the consumer by the person required to provide the notice". 12 CFR 1022.73(c). However, Plaintiff learned that he could not assert a private claim due to the violations of the notice timing requirements. Plaintiff instead chose to opt out of the arbitration agreement he signed and to never use financing through Carvana if he ever purchased another vehicle through their website.

23.	On or around August 17, 2020, Plaintiff visited carvana.com and requested an appraisal of the BMW 3 he purchased in August 2019. Plaintiff received an email notification from Carvana indicating the appraisal request was pending. Carvana never provided an appraisal for the BMW 3, still owns the BMW 3 and did not request pre-qualification for a loan during his visit to their website. *See* screenshot of the **Sell Appraisal** web page and the corresponding **Sell Appraisal Pending Response** email below:

**Sell Appraisal**



6

**Sell Appraisal Pending Response**

Your Carvana Vehicle Appraisal is Pending

 Carvana <Trades@Carvana.com>
8/17/2020 6:01 AM

To: artbhill@hotmail.com

To view this email in your browser, click here

 CARVANA     Chat with us ›
                                              Available 24/7



YOUR APPRAISAL IS PENDING
Your offer for your safe trade-in will be ready within 24 hours.

**Hello ARTHUR,**

Thank you for submitting an appraisal request for your 2016 BMW 3 Series.

We're reviewing the details you shared and, if we're able to buy your car, we'll email you within 24 hrs with our offer.

Due to recent market changes, we are buying vehicles on a limited basis. We re-evaluate supply and demand frequently, so feel free to submit another appraisal request in the future, even if you don't receive one tomorrow.

If we are able to make an offer on your vehicle, we're committed to keeping you safe throughout the process with "Touchless" delivery and drop-off procedures nationwide to maintain a safe distance. We're all in this together, and we're here to keep you moving, safely!



24.     Additionally, on August 17, 2020, Plaintiff began searching for BMW 5 series for sale. Plaintiff identified a 2016 model online at Carvana but it was not available. Plaintiff then requested notification of when the vehicle would be available at Carvana.com. Plaintiff received an email notification from Carvana acknowledging his request to be notified when the vehicle became available. *See* screenshot of **Notify Me Email** below:

7

## Notify Me Email



Carvana <CustomerAdvocate@Carvana.com>
6/11/2020 7:59 AM

loc-a-trans1@myownal.com

To view this email in your browser, click here.



1-800-333-4554
Available 8am–8pm MST



We've received your request!

We'll notify you right away if the 2016 BMW 5 Series you
have your eyes on becomes available for purchase.

[ VIEW THIS VEHICLE ]

Carvana never provided a notification of when the vehicle was available. Plaintiff did not request pre-qualification for a loan during this visit. On this same day, while having his BMW 3 serviced at Hendrick BMW in Charlotte ("Hendrick"), Plaintiff inquired into a 2017 BMW 5 that a sales associate located at the Rick Hendrick BMW dealer in Charleston with VIN # WBAJA5C31HWA35353. Plaintiff expressed interest in that vehicle and started the process for purchase while at the location. Although Plaintiff had already started the process to get financing from his bank, he asked the Hendrick sales associate if he could get financing terms in the meantime to see if they'd be better than Plaintiff's pre-arranged financing once approved. The associate did get terms from PNC Bank but the terms were not better than prearranged financing so Plaintiff went on to purchase a BMW 5 series from Hendrick through pre-arranged financing.

25.    On July 21, 2021, Plaintiff requested and received his Experian consumer disclosure

8

("Experian Report"). Upon inspection, Plaintiff observed Carvana had inquired into his credit three (3) times on April 7, 2020 and two (2) times on August 17, 2020 ("Unknown Inquiries"). The second date with 2 inquiries corresponds to Plaintiff requesting 1) a Sell Appraisal and 2) Notification of when a BMW 5 would become available as mentioned previously. *See* partially redacted credit report excerpt showing the soft inquiries attached hereto as **"Exhibit A"**.

26.     On July 28, 2021, Plaintiff called Carvana @ 800.333.4554 and spoke to someone who identified herself as "Sam" in post-sales. When Plaintiff inquired into the Unknown Inquiries, Sam could not explain why there were credit inquiries on April 7, 2020. As for the inquiries on August 17, 2020, Sam indicated the inquiries could have been due to the Appraisal request and that Carvana may do that for the convenience of customers in case they decide to purchase a car with a trade-in. When Plaintiff informed Sam that he never received an appraisal and that an appraisal of a vehicle is not a permissible purpose for credit inquiries, Sam indicated the appraisal was $0 and that the $0 appraisal appeared to have been a mistake. Sam did not provide a conclusive reason for the Unknown Inquiries and said her manager would contact Plaintiff the next day to discuss. Plaintiff was never contacted by anyone claiming to be Sam's manager.

27.     On July 29th, August 4th and August 9th 2021, Plaintiff called Experian to inquire into the permissible purposes for the Unknown Inquiries. Plaintiff wasn't provided permissible purposes on the first call. Plaintiff informed the Experian representative from the first two calls that had a permanent block on his file so the shouldn't be promotional inquiries. On the second call, this Experian representative informed Plaintiff that the reason Carvana provided as a permissible purpose for the Unknown Inquiries was pre-qualification. He also asked if the Plaintiff would like a promotional block placed on his file even though there should have been one in place

already. Nevertheless, Plaintiff said yes to have a promotional block placed. A different agent on the third call also indicated the unknown inquiries were pre-qualification but clarified that the codes used were based on written consent and were not codes used for promotional purposes. Plaintiff informed the Experian representatives that he did not authorize any of the Unknown Inquiries as he was not requesting any pre-qualification for financing from Carvana. Plaintiff does not know if Experian revealed all of the permissible purposes that were used by Carvana during his calls with them.

28.     Plaintiff also conversed with Carvana representatives via SMS text messaging. See full conversation attached hereto as "**Exhibit F**". One person claimed someone must have used the Plaintiff's Carvana account to make pre-qualification requests and suggested the Plaintiff change his password, a randomly generated password that Plaintiff himself didn't know from memory. Someone also stated the pre-qualification inquires can only be triggered online at carvana.com stating "Well someone did the pre-qualification without your consent or authorization. To avoid someone else using your Carvana profile...I thought of suggesting changing the password to avoid this, but I'm sorry, anything else you want assistant with?" When Plaintiff made the representative aware of information published by Carvana online which appears to explain what could have been occurring, a representative reinterated stating "Everything is online by the customer, if the credit history is inquired by us means someone using your profile to do so, we don't proactively do it ourselves." and then pretended to be confused about the topic of discussion stating "I'm sorry but what are you really requesting? I think we are having a huge misunderstanding and bad communication. I'm terribly sorry." *See* Carvana's online FAQ explanation attached hereto as "**Exhibit B**" which states:

10

> **"I bought my car months ago, why do I have a recent inquiry from Carvana on my credit report?**
>
> We know this was awhile ago and we hope you've enjoyed your new ride since then! When you agreed to the credit soft pull disclosure, this agreement allows Carvana to complete another credit soft pull at a future date in order to show you what your terms would be at that date if you traded in your vehicle or purchased a new vehicle. Don't worry, this has not affected your credit score! You have the option to opt out by contacting Carvana at creditoptout@carvana.com."

The above FAQ does not appear in a list of Frequently Asked Questions at

https://www.carvana.com/help/payment-and-financing as expected based on the URL. On

information and belief, Carvana removed or otherwise made this item difficult to find at some

point after complaints were made because it reasonably revealed the whereabouts of a hidden

disclosure. In fact, Plaintiff only found it using google search term "why do i have a credit

inquiry from carvana" and that, along with other clues from a Consumer Finance Protection

Bureau ("CFPB") complaint, is exactly how Plaintiff backtracked and discovered the hidden

disclosure. Furthermore, a search of Carvana's FAQ would return no results for **Exhibit B**.

29.     On information and belief, Carvana at some point trained their employees to make no

mention of the information found in **Exhibit B** and excluded it from any future training if it was

ever part of training. They also apparently removed **Exhibit B** from their list of Frequently

Asked Questions so that consumers like the Plaintiff could not find it. However, Carvana did not

delete the physical content or exclude it from being indexed by web crawlers making it available

in search engines such as google which allowed Plaintiff to find it by accident.

30.     As mentioned above, a complaint filed in December 2020 with the CFPB also appears

to explain why **Exhibit B** existed at some point. In one such complaint under the *Issue*:

'Improper use of your report' and *Sub-issue*: 'Credit inquiries on your report that you don't

recognize', a consumer stated in part (redacted):

> ". . . I immediately called Carvana to find out what was going on and ran into XXXX. I was very polite in asking him about the credit check, and the fact that I was never asked if it was ok to have them check my credit, nor did I sign any agreements, since there were none online to sign. ***He replied that there was an online agreement, that I just " didn't see it. " I asked him to go online and guide me too that agreement. He agreed to do so, but after a few seconds, told me that I had already signed the paper work, and that my " signature " covered it up so that it was no longer there.*** I had never heard of anything like that before in my entire life, and plus, I hadn't signed anything so I told him as much. We went back and forth as to why my credit was checked without my authorization, with him making up several different excuses, one being that they were a " different kind of car company " and another that I had already finished the application, which I hadn't. That still didn't give them a reason to pull my credit without my consent."

https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3985474

31.      Plaintiff did not provide written instructions to Carvana for the disclosure of any information from his credit files held by any consumer reporting agency beyond when he started and completed purchasing the BMW 3 in August 2019.  Carvana only had a permissible purpose under the FCRA in August  2019 due to a transaction initiated by the Plaintiff at carvana.com and that purpose would have allowed both soft and hard credit pull during the transaction without a hidden credit disclosure.

32.      On information and belief, Carvana regularly and in the normal course of business uses an initial loan pre-qualification request during a purchase financed through them, without express consent or knowledge of unsuspecting users, to falsely represent that written instructions were given to continue making credit inquiries in the future using a false permissible purpose of pre-qualification for a loan or other purpose even though the users are not visiting carvana.com and submitting pre-qualification requests.  These requests, which are not initiated by consumers, are more in line with promotional or account review inquiries which, on information and belief,

12

are not allowed when using Experian's pre-qualification services.

33. After discovering Carvana's FAQ seen in **Exhibit B** and the CFPB complaint Plaintiff set out to discover the disclosure by going to carvana.com and partially stepping through the web pages used to purchase a vehicle online.

34. Unbeknownst to the Plaintiff, Carvana inconspicuously placed the following text, hereinafter referred to as ("written instructions"), on the same page but out of view below two (2) prominently displayed buttons labeled "**GET MY FINANCING TERMS**" and "**CHANGE FINANCING TYPE**" which reads as follows:

> By clicking "GET MY FINANCING TERMS" I give Carvana written consent to obtain, now and periodically, consumer credit reports (Reports) about me from consumer reporting agencies to show current & future credit products & services I prequalify for when financing with Carvana. I understand this authorizes Carvana to get multiple Reports, which may appear as an inquiry on my Report, but will not impact my credit score. This authorization expires when my current account terminates unless I revoke earlier by contacting Carvana at creditoptout@carvana.com.

35. By design, Plaintiff would have never seen or realized the "written instructions" ever existed. *See* screenshot attached hereto as "**Exhibit C**" which is at default 100% zoom level showing there is no sign of any disclosure. *See* also a zoomed out screenshot attached hereto as "**Exhibit D**" revealing what was below the second button and out of view in **Exhibit C**.

36. As seen in **Exhibit C**, Plaintiff would need scroll down past the two buttons without being prompted in order to notice the disclosure even though he'd need to click the first button to get financing terms. Unprompted, the Plaintiff would have no reason for scrolling past the first button in search of a disclosure in the first place even if the text was in view. But *see* Carvana's stand-alone pre-qualification request web page which uses "clickwrap" method attached hereto as "**Exhibit E**". Plaintiff has never used the web page in **Exhibit E**.

37.     As seen, the same disclosure both **Exhibit D** (hidden) and **Exhibit E** (not hidden) require a user to agree to allow Carvana to inquire into their credit now and in the future yet **Exhibit E** confirms Carvana knows exactly how to obtain actual notice and affirmative agreement using "clickwrap" before proceeding.  Although only written instructions for **Exhibit D** is relevant in this case, it is readily apparent that both disclosures go beyond pre-qualification for a loan giving Carvana unlimited access unless revoked.  But see the Consumer Report disclosure below the "Get My Terms" button in **Exhibit E** which presents a different disclosure.

38.     On information and belief, Carvana has agreements with Experian where Carvana pays fees for access and use of pre-qualification services and Experian requires a clear and conspicuous method of obtaining written instructions via the internet which are substantially similar in form to the following examples labeled Figure A to D, all of which were discovered using an internet search:

14

**Figure A**

https://www.dealercenter.com/experian-terms/

1. Subscriber shall not use the Services unless Subscriber has a "permissible purpose" under the FCRA.

   a. If such "permissible purpose" is based on the written instructions of the consumer via the internet, then Subscriber shall substantially comply with the following web site requirements:

      (i) Subscriber will prominently display a message specifically informing the consumer that his or her credit profile will be consulted for the purpose for which it is to be used and no other purpose, and that clicking on the "I AGREE" button following such notice constitutes written instructions to the Subscriber under the FCRA. Subscriber agrees that the notice provided by Subscriber will be substantially as follows:

      "You understand that by clicking on the I AGREE button immediately following this notice, you are providing 'written instructions' to (Subscriber) under the Fair Credit Reporting Act authorizing (Subscriber) to obtain information from your personal credit profile or other information from Experian. You authorize (Subscriber) to obtain such information solely to (insert purpose e.g. to confirm your identity to avoid fraudulent transactions in your name.)

      (ii) The "I AGREE" button must immediately follow the notice provided for above. The notice and "I AGREE" button must be separate from any other notice or message contained on the web site.

      (iii) The consumer must have the ability to fully review any of the terms to which he or she is agreeing immediately preceding the consensual click.

      (iv) The consumer must not be able to proceed in the process without affirmatively agreeing to the terms in the notice.

      (v) The consumer must have the ability (should they choose) to print out the terms to which he or she is agreeing, including their consent.

      (vi) The record of the consumer's 'written instruction' by clicking "I AGREE" must be retained by Subscriber in a form that is capable of being accurately reproduced for later reference by the parties.

Case 1:21-cv-00714-CCE-LPA   Document 27-1   Filed 11/03/21   Page 15 of 49

## Figure B

https://www.sec.gov/Archives/edgar/data/1416265/000110465909035890/a08-29602_5ex10d3.htm

### EXPERIAN
### CONSUMER SERVICES SCHEDULE
### PRE-QUALIFICATION

### Exhibit A- Pre-qualification Instructions

1.      **Services.** This addendum is to be used for when a Client is doing Pre-Qualification or to check to see if a party is qualified for a certain firm offer of credit under the Fair Credit Reporting Act.

2.      Client shall follow the following processes when utilizing this pre-qualification service.

A.      **FCRA Compliance—Written Instructions.** Client shall substantially comply with the following web site requirements:

(1) Client will prominently display a message specifically informing the consumer that his or her credit profile will be consulted for the purpose for which it is to be used and no other purpose, and that clicking on the "I AGREE" button following such notice constitutes written instructions to the Client under the FCRA. Client agrees that the notice provided by Client will be substantially as follows:

"You understand that by clicking on the I AGREE button immediately following this notice, you are providing 'written instructions' to (*Client*) under the Fair Credit Reporting Act authorizing (*Client*) to obtain information from your personal credit profile or other information from Experian. You authorize (*Client*) to obtain such information solely to conduct a pre-qualification for a firm offer of credit.

(2) The "I AGREE" button must immediately follow the notice provided for above. The notice and "I AGREE" button must be separate from any other notice or message contained on the web site.

(3) The terms to which the consumer is agreeing immediately preceding the consensual click must be viewable by the consumer.

(4) The consumer must not be able to proceed in the process without affirmatively agreeing to the terms in the notice.

(5) The consumer must be provided with a statement of the hardware and software requirements for access to and retention of the terms to which he or she is agreeing, including their consent, and must consent in a manner that reasonably demonstrates that the consumer can access information in the electronic form that will be used to provide the information that is the subject of the consent.

(6) The record of the consumer's 'written instruction' by clicking "I AGREE" must be retained by Client in a form that is capable of being accurately reproduced for later reference by the parties.

16

**Figure C**

https://das.ohio.gov/Portals/0/Users/199/99/199/MCSA0087%20SIGNED.pdf?ver=5Pcsh0AYOSgv0rVla
CdNEw%3D%3D

(7) Written Instructions. Subsections 7(1) and 7 (2) below shall apply as described in Section 2 above.

    1.  FCRA Compliance—Written Instructions. Buyer shall substantially comply with the following web site requirements:

Buyer will prominently display a message specifically informing the consumer that his or her credit profile will be consulted for the purpose for which it is to be used and no other purpose, and that clicking on the "I AGREE" button following such notice constitutes written instructions to the Buyer under the FCRA. Buyer agrees that the notice provided by Buyer will be substantially as follows:

"You understand that by clicking on the I AGREE button immediately following this notice, you are providing 'written instructions' to (Buyer) under the Fair Credit Reporting Act authorizing (Buyer) to obtain information from your personal credit profile or other information from Seller. You authorize (Buyer) to obtain such information solely to

_____ (insert purpose e.g. to confirm your identity to avoid fraudulent transactions in your name.)

The "I AGREE" button must immediately follow the notice provided for above. The notice and "I AGREE" button must be separate from any other notice or message contained on the web site.

The consumer must have the ability to fully review any of the terms to which he or she is agreeing immediately preceding the consensual click.

The consumer must not be able to proceed in the process without affirmatively agreeing to the terms in the notice.

The consumer must have the ability (should he or she choose) to print out the terms to which he or she is agreeing, including their consent.

The record of the consumer's 'written instruction' by clicking "I AGREE" must be retained by Buyer in a form that is capable of being accurately reproduced for later reference by the parties.

17

secure and confidential manner in which it stores, delivers and transmits the Depersonalized Data to its authorized employee users.

**7. Written Instructions.** Subsections 7A and 7B below shall apply as described in Section 3B above.

**A. FCRA Compliance--Written Instructions.** Client shall substantially comply with the following web site requirements:

(1)     Client will prominently display a message specifically informing the consumer that his or her credit profile will be consulted for the purpose for which it is to be used and no other purpose, and that clicking on the "I AGREE" button following such notice constitutes written instructions to the Client under the FCRA. Client agrees that the notice provided by Client will be substantially as follows:

"You understand that by clicking on the I AGREE button immediately following this notice, you are providing 'written instructions' to (*Client*) under the Fair Credit Reporting Act authorizing (*Client*) to obtain information from your personal credit profile or other information from Experian. You authorize (*Client*) to obtain such information                solely                to _____ *(insert purpose e.g. to confirm your identity to avoid fraudulent transactions in your name.)*

(2)     The "I AGREE" button must immediately follow the notice provided for above. The notice and "I AGREE" button must be separate from any other notice or message contained on the web site.

(3)     The consumer must have the ability to fully review any of the terms to which he or she is agreeing immediately preceding the consensual click.

(4)     The consumer must not be able to proceed in the process without affirmatively agreeing to the terms in the notice.

(5)     The consumer must have the ability (should they choose) to print out the terms to which he or she is agreeing, including their consent.

(6)     The record of the consumer's 'written instruction' by clicking "I AGREE" must be retained by Client in a form that is capable of being accurately reproduced for later reference by the parties.

**B. Written Instructions by Telephone.** If Client is obtaining "written instructions" over the telephone, Client shall substantially comply with the following requirements which are designed to comply with the Electronic Records and Signatures in Commerce Act:

(1)     Client will ask each consumer to confirm his or her consent to access such persons credit report for authentication purposes by asking the following: "In order to verify your identity, you need to authorize Client to access your credit report for authentication purposes. Please confirm your authorization to access your credit report for authentication purposes by pressing the # key now";

(2)     The consumer must not be able to proceed in the process without affirmatively agreeing to allow access to his credit report as provided above; and

(3)     The record of the consumer's 'written instruction' by pressing the # symbol must be retained by Client in a form that is capable of being accurately reproduced for later reference by the parties.

**8. Referrals.** Client authorizes Experian to use Client's name in any reference list of current clients of Precise ID Services.

This Supplement, its exhibits, and if applicable, the Sign Up Form, together with the Agreement and its applicable Consumer Services Schedule as amended herein constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior proposals and agreements, both written and oral, and all other written and oral communications between the parties with respect thereto.

| Experian Information Solutions, Inc. | Williamson County Elections Department |
|---|---|
| | Print or Type Name of Client |
| By: *Heather Richey* | By: _____ |
| Signature (Duly Authorized Representative Only) | Signature (Duly Authorized Representative Only) |
| Name: Heather Richey | Name: _____ |
| Print | Print |
| Title: Compliance Director | Title: _____ |
| Supplement Effective Date: 5/31/2019 | |

18

39.     Based on the above Figures A-D, the below **"Example Credit Disclosure"** substantially complies with the required disclosure according to agreements Carvana should have with Experian and such notice must be clearly visible, appear alone without other disclosures or material and appear immediately prior to a consensual button to be clicked:

### Example Credit Disclosure

> You understand that by clicking on the **I AGREE** button immediately following this notice, you are providing 'written instructions' to Carvana under the Fair Credit Reporting Act authorizing Carvana to obtain information from your personal credit profile or other information from Experian. You authorize Carvana to obtain such information solely to pre-qualify you for financing with us.



As observed, it is absolutely clear that Carvana made no attempts to comply with the disclosure requirements.

40.     On information and belief, Experian knows their legal obligations under the FCRA to maintain reasonable procedures to limit the furnishing of consumer information to users who they reasonably believe have a permissible purpose.   Their pre-qualification agreements with its subscribers appear to be a reasonable first step towards maintaining reasonable procedures to limit furnishing information to users who they reasonably believe have a permissible purpose.  The fact that they had to articulate the method to obtain written instructions suggests they were keenly aware of the need to obtain affirmative written consent from consumers and that some users could abuse it, particularly on the internet.

41.     However, on information and belief, Experian does not maintain reasonably adequate

Case 1:21-cv-00714-CCE-LPA   Document 27-1   Filed 11/03/21   Page 19 of 49

procedures to investigate users who utilize their pre-qualification services before allowing access to those services. Likewise, discovery may reveal that Experian does not maintain reasonably adequate procedures intended to audit, monitor or detect anomalies, abuses or improper use of their pre-qualification services which are based on a consumer's written instructions. Although Experian makes a good show of drafting agreements that require a reasonably specific method for obtaining written instructions over the internet, they apparently stop short of implementing procedures to pre-verify, monitor or even audit subscribers when consumers contact them or regulatory agencies like the CFPB to inquire into or complain about inquiries they did not authorize.

42.     A written agreement between Experian and Carvana and the simple recitation of a permissible purpose of "pre-qualification – written insructions or consent" or "account review" by a used car dealership like Carvana does not automatically absolve Experian of its duty to protect confidential information when there are reasonable indications that the request was for other purposes.

43.     None of the Unknown Inquiries mentioned in this complaint were followed by a hard credit pull suggesting Plaintiff was visiting the website repeatedly for the sole purpose of requesting loan pre-qualification. If audited by Experian, Carvana could not produce any credible evidence during the audit showing they obtained Plaintiff's actual written authorization. Furthermore, there were multiple inquiries on each date and the dates were roughly 4 months apart. These inquiries standing alone should seem irregular or unusual coming from a used car dealership.

44.     Carvana knew that not conspicuously placing the disclosure statement prior to the button it referenced could be used to exploit the language found in 15 U.S.C. § 1681b(a)(2) and to overcome or circumvent promotional blocks that a consumer may have in place pursuant to 15

Case 1:21-cv-00714-CCE-LPA   Document 27-1   Filed 11/03/21   Page 20 of 49

U.S.C. § 1681b(e). Experian apparently knew this as well considering they explicitly require a specific method for obtaining written instructions.

45.     On information and belief, Carvana's pre-qualification service agreement with Experian requires that they only inquire into a consumer's credit solely for the purpose of pre-qualification for a loan when it is initiated by the consumer.  i.e. When a consumer visits carvana.com and requests it themselves.  Plaintiff did this once in August of 2019.

46.     Carvana knew there were issues with how they were obtaining written instructions when previous consumers like the Plaintiff questioned why there were credit inquiries well after a car purchase.  This is made even more obvious by Carvana's decision to place a response to these questions in the Frequently Asked Questions section of their website as seen in **Exhibit B.** Carvana was also on notice about improper credit inquires due to consumer complaints with the CFPB since no later than 2017.  Carvana knew consumers were likely oblivious to their hidden credit disclosure when the consumer made a prior purchase financed through Carvana, yet they persisted with using the same making no changes.  Carvana never referred to **Exhibit B** when Plaintiff asked about the unknown inquiries.

47.     Experian either knew or should have known of issues with Carvana as well given there is some evidence of complaints with the CFPB that mention attempts to get inquiries removed by consumers who claim the CRA and Carvana would send the consumers back and forth about getting credit inquiries removed when they know the inquiries are literally statements of fact that Carvana inquired into the consumer's credit without apparent authorization and could not be disputed.

48.     Carvana knew the Plaintiff did not visit their website and request financing terms online when they requested information from the Plaintiff's credit file with Experian on April 7,

2020 and on August 17, 2020. Carvana did not use information they obtained from Experian to pre-qualify Plaintiff for financing or provide financing terms to the Plaintiff since Plaintiff never requested any. They also were not using information for the purpose of collecting a debt due to default and neither was the actual servicer, Bridgecrest. If Carvana used a permissible purpose of pre-qualification but used it for something else or nothing at all, Carvana still falsely certified a permissible purpose.

49.     Aside from emails related to Plaintiff's purchase in 2019 along with sell appraisal and request to be notified when a vehicle became available in August 2020, Carvana only sent marketing and promotional emails to the Plaintiff. The only methods Carvana provides for obtaining finance terms are at carvana.com and must be initiated by a user as admitted in SMS messages exchanged with the Plaintiff. But Carvana's credit inquiries appear to be systemic and triggered outside of any legitimate business purpose.

50.     Furthermore, even if Plaintiff did request a pre-qualification triggering the five Unknown Inquiries mentioned herein, which he did not, Carvana did not provide any finance terms at all which should constitute an adverse action triggering their obligations under the FCRA to provide at least five adverse action notices to the Plaintiff, which they did not. Additionally, if the Plaintiff ever used the "Get My Finance Terms" button an additional 5 times without completing a purchase, which he did not, Plaintiff would have received emails with a subject containing "Your Hold Has Expired", indicating a temporary hold on a vehicle during a purchase process had expired. Plaintiff received no emails from Carvana on April 7, 2020 and did not receive any emails in August 2020 with the subject containing "Your Hold Has Expired".

51.     On information and belief, Carvana regularly and in the ordinary course of business, makes inquiries into the credit of persons who, in the past, purchased a vehicle financed with

Carvana, under the guise that the consumers again visited carvana.com and provided written instructions for loan pre-qualification when in fact the inquiries are initiated by Carvana without knowledge or consent of many if not most unsuspecting consumers due the deceptive manner in which written instructions are obtained. Carvana then uses the falsely obtained written instructions to falsely certify a permissible purpose of pre-qualification to Experian creating the appearance that a consumer visited carvana.com, where they conduct business exclusively, and initiated the requests.

52. On information and belief, Experian's audit(s) of Carvana, if any, would show that Carvana is not or may never have complied with their agreements regarding the procedures used for obtaining written instructions under the FCRA over the internet and any written instructions supposedly obtained were not authentic or genuine. Considering Carvana is nothing more than a used car dealership who just happens to conduct business exclusively online, Experian should have known Carvana's activities regarding the pre-qualification for loan services were irregular at best; and at worst, in violation of their agreements and the FCRA giving cause for remedial actions up to and including termination of Carvana's contract to use their pre-qualification services. Furthermore, Experian knew or should have known about publically available Complaints submitted to the CFPB regarding Carvana improperly accessing consumer credit information as well as complaints to Experian regarding Carvana.

53. As it pertains the Unknown Inquiries referenced throughout this complaint for the the year 2020 and beyond, Plaintiff (1) was not under a court order to have his credit report pulled from Experian by Carvana; (2) did not furnish written instructions to Carvana for obtaining his credit report to pre-qualify; (3) did not seek employment with Carvana; (4) did not apply for additional financing through Carvana to be serviced by Bridgecrest; (5) did not apply for insurance

23

from Carvana; (6) did not apply for any government licenses or benefits from Carvana and government agencies were not involved and (7) was not in default in making timely payments to the servicer Bridgecrest. As it pertains to August 17, 2020, Plaintiff requested a vehicle appraisal for his BMW 3 and to be notified when a BMW 5 Series became available. Neither action provided Carvana with a permissible purpose under the FCRA for obtaining information from Experian related to the Plaintiff.

54. Carvana, by using a deceptive method to falsely obtain written instructions from the Plaintiff for future credit file access, falsely certified their purpose to Experian to appear as a loan pre-qualification that was initiated by the Plaintiff when they themselves initiated each request. In doing so, Carvana effectively bypassed the requirements of 15 U.S.C. § 1681b(c)(2), causing Experian to provide information which bypassed a promotional block Plaintiff had in place and exceeded the limits of information Experian would otherwise provide consisting of (A) the name and address of a consumer; (B) an identifier that is not unique to the consumer and that is used by the person solely for the purpose of verifying the identity of the consumer; and (C) other information pertaining to a consumer that does not identify the relationship or experience of the consumer with respect to a particular creditor or other entity. They also falsely certified purposes that indicated transactions were initiated by the Plaintiff.

55. Carvana, intentionally designed their website to, among other things, conceal credit disclosure text just out of view of the webpage viewing area, knowing that most, if not all users of their website would not notice it because of its placement below the button they would click to get financing terms as well as another unrelated button below it. Carvana's concealment prevented the Plaintiff from realizing they were attempting to get unlimited access to his credit information which would have caused the Plaintiff to back out of the purchase and take his business elsewhere,

24

denying them the profits from the deal.

56. On information and belief, consumers have filed complaints against Experian with the CFPB indicating that Carvana had improperly accessed their credit information but Experian did not conduct reasonable audits or investigate whether Carvana was complying with their agreements regarding FCRA compliance.

57. On information and belief, more than 300,000 consumers have purchased vehicles financed through Carvana using their "GET MY FINANCING TERMS" button/box and many, like the Plaintiff, were completely oblivious to the disclosure hiding below on the same page. Of those consumers, based on public complaint data, only 28 have apparently noticed that Carvana inquired into their credit without explanation and filed complaints with the CFPB against Carvana as of the filing of the original complaint. And at least one of those complaints involved a consumer being told they agreed to credit inquiries related to **Exhibit B** but Carvana would not aid that consumer in locating the hidden disclosure, even though they could have. And other complaints suggest consumers contacted Experian regarding Carvana's actions in attempts to have unauthorized credit inquiries removed. And with the exception of this case, Plaintiff has searched but cannot find a single lawsuit alleging violations of the FCRA against Carvana tied to their concealed credit disclosure.

### Plaintiff's 1681g Consumer Disclosures From Experian

58. As mentioned herein, Plaintiff requested his consumer disclosures from Experian but he had to contact Experian to inquire into the permissible purposes used by Carvana.

59. Plaintiff placed a 5 year promotional block on his credit with the bureaus in 2012 and by 2013 he had placed a permanent block which was not removed. Of the 3 major CRAs, Experian is the only CRA that does not provide some indication of whether any promotional block exists on

25

a consumer disclosure. Starting in 2013, Equifax listed the block as "File Blocked for Promotional Purposes" and Trans Union listed the block as "PROMOTIONAL OPT-OUT: This file has been opted out of promotional lists supplied by TransUnion. (Note: This opt-out has no expiration date.)".

60.     Experian does not a) list the permissible purposes for credit inquiries that are not initiated by a consumer in consumer disclosures, b) does not list permissible purposes for pre-qualification inquiries that are [NOT] initiated by a consumer in consumer disclosures and c) does not list permissible purposes for pre-qualification inquiries that [ARE] initiated by a consumer. Experian should provide the permissible purpose in consumer disclosures for the later at a minimum because these inquiries may be used by Experian in one or more of their products to alert their paying customers about consumer activity.

61.     Pre-qualification inquiries by their nature must be initiated by a consumer. These inquiries are usually the result of a consumer (or identity thief/unauthorized person) initiating requests to be pre-qualified for a benefit such as a loan or revolving line of credit. Additionally, these inquiries are not excluded from information that may be reported to third parties under 15 U.S.C. § 1681b(c)(3) which states: "Information regarding inquiries. Except as provided in section 609(a)(5) [§ 1681g], a consumer reporting agency shall not furnish to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer.". In other words, Experian and other CRAs may furnish a list of pre-qualification inquiries in credit reports or other products to third parties but they can only furnish a list of inquiries that are not initiated by a consumer in a consumer disclosure as provided in section 609(a)(5) [§ 1681g].

62.     In this case, Experian uses the consumer initiated inquiries reports provided to their clients and also to indicate to their customers that a consumer is "shopping for credit" in one or

26

more of their products. One such product is Prospect Triggers which uses new tradelines, inquiries and certain loans nearing term as one example. On information and belief, this information can be provided to Experian's clients without the need for those clients to make any inquiry that appears on a consumer disclosure, including consumers who have promotional blocks in place. This also suggests these clients can market to consumers without the need indicate they were making firm offers of credit based in part on information that was derived from consumer data maintained in Experian's databases.

63.     Experian also collects income data from the IRS and provides that information to help in making credit decisions. They also have products that they claim to predict income of a consumers using data from their consumer databases and would aid in determining a consumer's overall creditworthiness. Some of the products that use income include Income Insight, Income Insight W2, Debt-to-Income Insight and Debt-to-Income Insight W2. Experian's clients can even have income data included in credit reports they request. But Experian does not disclose any income data in a consumer disclosure.

64.     As mentioned earlier, Plaintiff had to contact Experian to determine the permissible purposes used by Carvana. During 2 of those calls, Plaintiff was provided only partial information regarding the permissible purpose assuming that was accurate. He was provided additional information (i.e. "written consent" or "written instructions") on a third call and is still unsure if all permissible purposes for the Unknown Inquiries were disclosed. Yet, Experian has products that will instantly alert their paying customers when a consumer (or an identity thief/unauthorized person) is shopping for credit while the consumer is in the dark because they never alert a consumer via credit monitoring regarding this type of inquiry.

65.     Plaintiff should not have to call Experian to determine why a user inquiried into his

credit, especially when the inquiry is one that was supposedly initiated by the Plaintiff himself. This information should be available in credit monitoring and consumer disclosures.

66.     Experian only provides a misleading soft inquiry header in consumer disclosures which states "Soft inquiries are usually initiated by others, like companies making promotional offers of credit or your lender conducting periodic reviews of your existing credit accounts.", leaving consumers confused about who had a permissible purpose and who did not.  As an example, Plaintiff placed a permanent promotional block on his files in 2013.  He would be unable to determine if Experian was violating the FCRA by allowing promotional inquiries to occur when he had a promotional block in place on his files with the CRAs due to no disclosure of any permissible purposes.  And because the opt out system is maintained jointly by the nationwide CRAs, Plaintiff had no reason to believe Experian did not maintain a promotional block because the promotional block appeared prominently on his disclosures from Equifax, Trans Union and Innovis.  Plaintiff had no reason to believe a block was not present until he contacted Experian and a representative asked if he wanted to place a block on his file as if no block already existed.

67.     Plaintiff was and is still unable to determine if Carvana was and still is initiating credit inquiries using false permissible purposes of pre-qualification or other reasons because there are no permissible purposes listed in his consumer disclosure.  Instead, he was forced to call Experian and got responses that may be incomplete.  And even now, Plaintiff is unable to determine if Experian actually maintains a permanent promotional block on his credit file with them because there is no indication of any promotional block listed in his consumer disclosures from them.  For Experian, the absence of a promotional block indicator can't mean a promotional block exists and does not exist at the same time.  Discovery may reveal that Plaintiff's information maintained by Experian could have been provided to third parties for marketing and promotional purposes

28

without his knowledge, including information related to a data breach involving Experian and Alteryx. And Experian already provides their clients with real-time alerts when a consumer is "shopping for credit". This same type of alert would not be available to consumers even when they could be the result of an identify thief or unauthorized person using the consumers information. For example, Plaintiff is enrolled in Experian IdentityWorks service which includes credit monitoring. Experian not only doesn't list any soft inquiries in the product but it never alerted the Plaintiff that he or some identity thief or unauthorized person was "shopping for credit" using his information.

68.     Although Carvana provided a risk-based pricing notice indicating they procured at least the Plaintiff's credit score from Experian on August 17, 2019, there is no indication of an inquiry by Carvana for this date on the Plaintiff's consumer disclosure from Experian.

69.     The non-disclosure of permissible purposes, a promotional block and other information from Plaintiff's consumer disclosure appears to be designed to keep the Plaintiff ignorant of his rights until applicable statute of limitation periods expire.

### Carvana's Terms Of Use / Arbitration Bait And Switch

70.     The Plaintiff, having discovered the Carvana had avoided bringing his attention to a credit disclosure in order to continue making inquiries into his credit in the future, also sought to discover if more surprises were buried in their website or in documents he received from them.

71.     Upon reviewing the electronically signed Arbitration Agreement that Plaintiff actually received, he noticed the last sentence in a section labeled "Miscellaneous" made an ambiguous reference to another arbitration agreement. It stated "***This agreement (if you do not reject) will supersede any prior arbitration agreement between you and us with respect to any***

Case 1:21-cv-00714-CCE-LPA   Document 27-1   Filed 11/03/21   Page 29 of 49

*Claim.*" Under another section labeled "Your Right to Reject this Agreement", it includes the following last sentence: "*If you reject this Agreement, that will not constitute a rejection of any prior arbitration between you and us.*". From this, Plaintiff suspected that there was an unknown or undisclosed arbitration agreement if he chose to opt-out of the one he signed electronically, rendering the opt-out provision in the written arbitration agreement an illusion.

72.     Convinced something else may have been hidden, Plaintiff revisited carvana.com to track down any other inconspicuous disclosures and discovered that Carvana used a similar method to ensure Plaintiff's attention would not be drawn to any disclosures that could jeapordize a sale. In this case, another disclosure was inconspicuously placed below two (2) prominently displayed buttons/boxes as a link to Carvana's Terms of Use ("TOU") during the process of creating a carvana.com account profile.

73.     The TOU link remains fully out of view until the last moment while a user would have been pre-occupied filling in an account creation form. The TOU hyperlink refers to https://www.carvana.com/terms-of-use and can be seen below at 100% default zoom level in **Figure E** below when all form fields are filled in to create an account although other disclosure information remains concealed and out of view.

***[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]***

**Figure E**



74.     The "CREATE MY ACCOUNT" button/box is initially disabled when a user first lands on the page and the TOU link is also hidden as seen below below at 100% default zoom level in **Figure F**:

**Figure F**



31

75.     A user would then proceed with filling out the form to create an account.  When all but one of the required pieces of information has been filled in, part of the information related to the TOU is exposed below the 2 prominently displayed buttons as seen below in **Figure G**:

**Figure G**



76.     Notably, the "CREATE MY ACCOUNT" button/box is enabled after a user enters their name, email address, phone number, zip code and passwords but actual notice or agreement to the TOU is not required to proceed.  This made the conspicuous placement of the TOU most relevant because the method used is referred to as "browsewrap" or "sign-up wrap".  For example, the TOU disclosure could have come immediately before, next to or after the "CREATE MY ACCOUNT" button/box to increase the likelihood of being noticed.  But even if the TOU was visible the entire time without those changes, there would be no constructive knowledge since the disclosure was in the bottom left corner and not closely coupled with the "CREATE MY

32

ACCOUNT" button.

77.      If acutal or constructive knowledge of the TOU were desired, Carvana could have

easily implemented a method that was conspicuous.  For example, Carvana could have presented

the disclosure as demonstrated in below **Example #1, Example #2** and **Example #3**:

- **Example #1** – immediately below the button



By clicking "CREATE MY ACCOUNT" above, you certify that you
have read and agree to **Carvana's Terms of Use**

- **Example #2** – immediately above the button

By clicking "CREATE MY ACCOUNT" below, you certify that you
have read and agree to **Carvana's Terms of Use**



- **Example #3** – immediately to the left of the button

By clicking "CREATE MY ACCOUNT" to the right, you
certify that you have read and agree to **Carvana's Terms of
Use**



In each example above, the disclosure is tightly coupled with the button, making them more

conspicuous to a user and may provide actual or constructive notice that if the button is clicked,

the user is manifesting assent to the TOU.  At that point, if a user DID NOT agree, they would

have an opportunity to avoid creating an account or they could proceed with knowledge that they

could opt out by mail within 30 days, assuming they actually read the TOU.

78.      If a user DID agree to the TOU and proceeded, it was on them to read the extensive

contents of the TOU and they could be bound by its terms unless they took affirmative steps to opt

33

out or otherwise express their disagreements with the terms. Many consumers may not actually read, discover or understand the arbitration terms even if they did have notice of the TOU. But Carvana merely made sure the TOU link would dangle below two prominently displayed buttons just long enough to create the appearance that there was an inkling of constructive notice. That period of time would be from the time a user started entering the last piece of information on the form (i.e. confirm password) until the time they clicked the "CREATE MY ACCOUNT" button. That's perhaps 1-3 seconds. As mentioned, most of the disclosure text still would have remained hidden even after all form fields were completed.

79. Given the purpose of the create account web page was to create a user account, a required step to get financing terms, Plaintiff would have naturely followed the flow of the web page by filling in the form fields, clicking the "CREATE MY ACCOUNT" button/box and moving on to getting his finance terms to complete the purchase of the BMW 3 just as he did. If Carvana actually wanted to draw attention to the TOU, they could have as it is not difficult as seen in **Example #1, Example #2** and **Example #3** above. But that would have run the risk of loosing some sales to people who would read lengthy documents or at least search for words like "arbitration". In either case, the "CREATE MY ACCOUNT" button/box did not and does not in any way provide actual or constructive notice that clicking it would manifest assent to the TOU and Plaintiff did not assent to the TOU.

80. Carvana had good reason to avoid bringing attention to the TOU as no reasonable person would agree to it assuming they ever noticed, read and understood it. Buried within the take-it-or-leave-it TOU is an arbitration agreement ("backup arbitration agreement"). It is so one-sided it could and perhaps should be considered unconscionable. The arbitration agreement is buried below at least 65 paragraphs at or around page 11 in a document that is roughly 33 pages

in length when printed under a heading labeled "K. Disputes and Jurisdiction:".

81.    The terms of the backup arbitration agreement differ drastically and materially from the written arbitration that the Plaintiff signed but opted out of. The terms are so unfavorable to a user that it is not worth bringing a claim at all because the awards in many cases would be zero based on the terms even if successful. Portions of the terms are as follows:

"...

**K. Disputes and Jurisdiction**

...

2. In any dispute between us, your sole remedy is to stop using your account/profile and/or the Service...

...

5. You agree that, regardless of where you access, visit and/or use the Service, all issues concerning the construction, validity, interpretation and enforceability of the Agreement shall be governed and construed in accordance with the laws of the United States, in the particular State where the Service is headquartered, without regard to any principles of conflict of laws. Any disputes that are not arbitrated or otherwise result in court action will be resolved exclusively by a state or federal court located in the U.S. State where the Service is headquartered, and you specifically consent to the personal jurisdiction of such courts and waive any claim of forum non-conveniens. Should there be a conflict between the laws of the U.S. State where the Service is headquartered, and any other laws, the conflict will be resolved in favor of the laws of such U.S. State where the Service is headquartered. To the extent permitted by applicable law, all judgments or awards shall be limited to actual out-of-pocket damages (excluding attorneys' fees) and shall not include any indirect, punitive, incidental and/or consequential damages."

For comparison, a copy of the written arbitration agreement the Plaintiff signed electronically and opted out of is attached hereto as "**Exhibit G**".

82.    The backup arbitration agreement (a) requires users from a across the country to have their claims resolved in and interpreted by the laws of Arizona where Carvana is headquartered,

35

(b) allows no recovery of attorney fees and (c) limits judgments or awards to actual out-of-pocket damages. Were Carvana to succeed in compelling arbitration based on the TOU, many consumers would not have an adequate remedy because arbitration would be a futile illusion and attorneys would not have any incentive to represent them. Likewise, Carvana would have no deterrent from engaging in unfair or deceptive practices.

83. The TOU also allows Carvana to make changes to the terms online whenever it chooses without any user having to receive, acknowledge or agree to such changes. Rather, any continued use of the website using their account/profile would constitute an agreement with the TOU and implies Carvana could apply it even to those who chose to opt-out but later visits their website.

84. The backup arbitration agreement also provided an opt-out by mail option which must be done within 30 days, similar to one of the options provided in the written arbitration agreement which the Plaintiff signed and opted out of by email. But in this case, there would have been no opportunity to view much less opt out and that, under the circumstances, must have been the intended result, for if Plaintiff opted out of the written arbitration agreement, as he did in this case, the backup arbitration agreement would be waiting to take its place. Likewise, if the backup arbitration agreement was noticed and opted of but the written arbitration agreement was not opted out of, the written arbitration agreement would take its place. In essence, if a consumer chose to opt out of the written arbitration agreement, Carvana could use the backup arbitration agreement if necessary to complete a bait-and-switch arbitration scheme and the compel arbitration killing most claims in their tracks.

85. As the TOU provision K.2 mentioned above provides for an exclusive remedy if a user does not agree with the TOU, Plaintiff contacted Carvana via online chat and was told "To

36

disable your account, please reach us at 1-800-333-4554. We're available 7 days a week between the hours of 8 AM - 10 PM EST.".  So, on August 24, 2021 at approximately 10:00 AM EST, Plaintiff called Carvana at that number and requested that his account with carvana.com be disabled to prevent any further use.

86.    Given the ease in which Carvana could have, but did not, bring attention to the TOU during account creation using a conspicuous method, their actions or inactions were likely intended to ensure the Plaintiff and other users did not actually notice it so that they could get the sale but then use it later if the written and signed arbitration agreement was opted out of.

87.    On information and belief, Carvana has successfully compelled arbitration when a customer did not opt out of the written arbitration agreement seen in **Exhibit G** but they had not yet relied upon backup arbitration agreement found in their TOU when filing a motion to compel or stating a defense in a responsive pleading or answer.

## CLAIMS FOR RELIEF

## COUNT 1 - WILLFUL VIOLATION OF 15 U.S.C. § 1681b(f)(1)

88.    Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

89.    As described herein, Carvana obtained at least 5 consumer reports from Experian in April 2020 and August 2020.

90.    Defendant Carvana willfully violated 15 U.S.C. § 1681b(f)(1) at least five (5) times by obtaining information from the Plaintiff's credit file for a purpose not authorized under 15 U.S.C. § 1681b(a) or a legitimate business purpose.

91.    Due to defendant Carvana's actions or inactions they are liable to the Plaintiff for statutory damages as to each violation along with costs to be determined pursuant to 15 U.S.C. §

37

1681n(a)(1)(A) and 1681n(a)(3).

92.    Defendant Carvana's actions or inactions were willful rendering it liable to the Plaintiff as to each violation for punitive damages in an amount to be determined at trial pursuant to 15 U.S.C. § 1681n(a)(2).

## COUNT 2 - WILLFUL VIOLATION OF 15 U.S.C. § 1681b(f)(2)

93.    Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

94.    As described herein, Carvana obtained at least 5 consumer reports from Experian in April 2020 and August 2020.

95.    Defendant Carvana falsely certified a permissible purpose under 15 U.S.C. § 1681b(a)(2) regarding written instructions from the Plaintiff at least five (5) times.  At the same time, Carvana falsely certified a permissible purpose under either 15 U.S.C. § 1681b(a)(3)(A) or 15 U.S.C. § 1681b(a)(3)(F)(i), each of which requires a transaction that must be initiated by the Plaintiff when they knew the Plaintiff did not initiate any transactions after August 2019 and he did not provide written instructions allowing them to continue inquiring into his credit.

96.    As a result, defendant Carvana violated 15 U.S.C. § 1681b(f)(2) at least five (5) times by falsely certifying to Experian that they obtained Plaintiff's consumer report for a purpose authorized under 15 U.S.C. § 1681b(a) when they did not have Plaintiff's written authorization to procure any information and Plaintiff did not initiate any transaction for loan pre-qualification.

97.    Due to defendant Carvana's actions or inactions they are liable to the Plaintiff for statutory damages as to each violation along with costs to be determined pursuant to 15 U.S.C. § 1681n(a)(1)(A) and 1681n(a)(3).

98.    Defendant Carvana's actions or inactions were willful rendering it liable to the

Plaintiff as to each violation for punitive damages in an amount to be determined at trial pursuant to 15 U.S.C. § 1681n(a)(2).

## COUNT 3 - INVASION OF PRIVACY

99.      Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

100.      Defendant Carvana knowingly, willfully and intentionally, without Plaintiff's consent or knowledge, invaded and intruded into the private affairs of the Plaintiff by requesting and receiving non-public information from Plaintiff's credit file with Experian no less than five (5) times.

101.      Defendant Carvana's actions were highly offensive to Plaintiff and would be highly offensive to a reasonable person.

102.      As a result of Defendant Carvana's willful and knowing actions, it is liable to the Plaintiff for compensatory and punitive damages to be decided by a jury.

## COUNT 4 – FRAUD - OBTAINING WRITTEN INSTRUCTIONS

103.      Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

104.      Defendant Carvana knowingly, willfully and intentionally ignored agreements with Experian regarding the manner in which they MUST obtain written instructions for the purpose of concealing disclosure information from the Plaintiff in order to falsely represent that the Plaintiff had given written instructions for them to have unlimited access to his credit information for any reason of their choosing in the future.

105.      Carvana's advertising related to providing financing terms using a soft inquiry without affecting credit scores coupled with  their strategic placement of their credit disclosure

39

statement out of view in relation to the button Plaintiff would eventually click was made with the intent to deceive and did deceive the Plaintiff into believing they would only access Plaintiff's credit information based on the transaction that Plaintiff initiated in August 2019 in order to pre-qualify and ultimately finance a vehicle he purchased.

106.    As a result of the Carvana's knowing, willful and intentional acts of concealing material information which would have prevented the Plaintiff from continuing with the purchase of a BMW 3, Plaintiff was injured when Carvana, without knowledge of the Plaintiff, falsely obtained his consent to inquire into his credit for any reason whatsoever and invaded his legally protected right to privacy on at least five separate occasions.

107.    As a result of Carvana's knowing, willful and intentional actions or inactions, Carvana is liable to the Plaintiff for compensatory and punitive damages to be determined by a jury.

## COUNT 5 - VIOLATION OF N.C.G.S. § 75-1.1

108.    Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

109.    Carvana was at all times relevant to this complaint engaged in business in or affecting commerce in this state.

110.    As stated herein Carvana engaged acts or practices that are unfair and deceptive.

111.    Carvana used unfair and deceptive means to manufacture Plaintiff's written instructions allowing them unlimited access to his credit file with Experian when they knew they had no legitimate business purpose and the purposes they certified were not authorized and false. Each instance in which Carvana falsely certified and obtained Plaintiff's information from

40

Experian violating Plaintiff's right to privacy is a separate violation of N.C.G.S. § 75-1.1.

112.    Carvana, by engaging in deceptive acts or practices in or affecting commerce is liable to the Plaintiff for compensatory damages to be determined by a jury upon a finding by the Court that they violated N.C.G.S. § 75-1.1 as a matter of law.

113.    If the Court finds that Carvana violated N.C.G.S. § 75-1.1 and a jury awards compensatory damages then Carvana is liable to the Plaintiff for treble damages pursuant to N.C.G.S. § 75-16.

## COUNT 6 - VIOLATION OF 15 U.S.C. § 1681e(a)

114.    Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

115.    Section 607(a) of the FCRA, 15 U.S.C. § 1681e(a), requires a consumer reporting agency to maintain reasonable procedures and prohibits a consumer reporting agency from furnishing a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose.

116.    As described herein, Defendant Experian provided at least 5 consumer reports to Carvana in April 2020 and August 2020.

117.    As described herein, Defendant Experian took no reasonable actions to investigate whether Carvana was complying with agreements they have with Experian regarding their services when Plaintiff contacted them on 3 separate occasions.

118.    As described herein, Defendant Experian failed to maintain reasonable procedures to limit the furnishing of Plaintiff's consumer reports to Carvana when those reports were obtained under false pretenses and not obtained or used for a purpose authorized under the FCRA.

119.    Defendant Experian's actions or inactions were willful and reckless rendering them

41

liable to the Plaintiff for statutory damages between $100 and $1000, punitive damages and costs pursuant to 15 U.S.C. § 1681n.

## COUNT 7 - VIOLATION OF 15 U.S.C. § 1681b(c)(1)

120.    Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

121.    15 U.S.C. § 1681b(c)(1) requires that Experian only provide information to Carvana if it was in connection with a credit transaction or insurance that was not initiated by the Plaintiff and only if the Plaintiff authorized them to provide such report to Carvana.

122.    As described herein, Defendant Experian did not maintain reasonable procedures to limit furnishing of credit reports and as a result,  Experian provided at least 5 consumer reports to Carvana in April 2020 and August 2020 even though a) none of those requests involved credit transactions,  b) Carvana has never had any written instructions to do so and c) Plaintiff did not authorize Experian to do so.

123.    As described herein, Defendant Experian took no reasonable actions to investigate whether Carvana was complying with agreements they have with Experian regarding their services when Plaintiff contacted them on 3 separate occasions.

124.    Defendant Experian's actions or inactions were willful and reckless rendering them liable to the Plaintiff for statutory damages between $100 and $1000, punitive damages and costs pursuant to 15 U.S.C. § 1681n.

## COUNT 8 - VIOLATION OF 15 U.S.C. § 1681b(a)(2)

125.    Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

126.    15 U.S.C. § 1681b(a)(2) requires that Experian only provide information to Carvana if

42

in accordance with Plaintiff's written instructions.

127. As described herein, Defendant Experian did not maintain reasonable procedures to limit furnishing of credit reports based on a consumers written instructions and as a result, Experian provided at least 5 consumer reports to Carvana in April 2020 and August 2020 even though a) none of those requests were initiated by the Plaintiff, b) Carvana has never had any written instructions to do so and c) Plaintiff did not authorize Experian to do so.

128. As described herein, Defendant Experian took no reasonable actions to investigate whether Carvana was complying with agreements they have with Experian regarding their services when Plaintiff contacted them on 3 separate occasions.

129. Defendant Experian's actions or inactions were willful and reckless rendering them liable to the Plaintiff for statutory damages between $100 and $1000, punitive damages and costs pursuant to 15 U.S.C. § 1681n.

## COUNT 9 - VIOLATION OF 15 U.S.C. § 1681g

130. Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

131. 15 U.S.C. § 1681g requires Experian to clearly and accurately disclose all information in a consumer's file at the time of the request.

132. 15 U.S.C. § 1681a(g) defines the term "file," when used in connection with information on any consumer, as all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored.

133. Experian maintains the permissible purpose for each credit inquiry they maintain on file regarding the Plaintiff regardless of whether it involves a transaction initiated by the Plaintiff or one that is initiated by a user. Experian also maintains whether a promotional block was

43

requested by the Plaintiff.

134. At the times Plaintiff requested the last two consumer disclosures, Experian did not disclose the existence of any promotional block, the permissible purposes for credit inquiries that were not excluded under 15 U.S.C. § 1681b(c)(3) which include pre-qualification inquiries or any income data which they collect or predict. Experian has never provided this information in a consumer disclosure provided to the Plaintiff.

135. At the times Plaintiff contacted Experian via phone and inquired into the permissible purposes used by Carvana, Experian did not fully disclose the permissible purposes or did not disclose all of the permissible purposes. Experian also failed to disclose any inquiry related to Carvana being provided information about the Plaintiff on August 17, 2019 regarding a risk-based pricing notice.

136. As a result of Experian's failure to disclose all information they maintain on their files regarding the Plaintiff, they violated 15 U.S.C. § 1681g.

137. Defendant Experian's actions or inactions were willful and reckless rendering them liable to the Plaintiff for statutory damages between $100 and $1000, punitive damages and costs pursuant to 15 U.S.C. § 1681n.

## COUNT 10 - VIOLATION OF 15 U.S.C. § 1681b(e)

138. Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

139. 15 U.S.C. § 1681a(g) defines the term "file," when used in connection with information on any consumer, means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored.

140. Experian maintains whether a promotional block is present on file regarding the

44

Plaintiff.

141. 15 U.S.C. § 1681b(e) required Experian to place a permanent promotional block on the Plaintiff's credit file starting no later than 2013 and maintain that block unless the Plaintiff elected to have it removed. Plaintiff only needed to inform one of the nationwide CRAs to opt out or use another method such as telephone because the opt out system is jointly maintained.

142. At the times Plaintiff requested the last two consumer disclosures, Experian did not disclose the existence of any promotional block. At no time since the Plaintiff added a promotional block in 2012 and a permanent block in 2013 has Experian provided any indication that a promotional block was in place on his file with them. Although Plaintiff requested a permanent block on his files in 2013, Experian asked the Plaintiff if he wanted a promotional block after he informed them that he had one in place since 2013 and then supposedly placed a temporary block on his files. Even after this, there is no way to verify the existence of a promotional block and a temporary block should not replace a permanent block.

143. As a result of Experian's failure to comply with the FCRA regarding Plaintiff's temporary and later a permanent opt out notice, they violated 15 U.S.C. § 1681b(e).

144. Defendant Experian's actions or inactions were willful and reckless rendering them liable to the Plaintiff for statutory damages between $100 and $1000, punitive damages and costs pursuant to 15 U.S.C. § 1681n.

## COUNT 11 – FRAUD - ARBITRATION BAIT AND SWITCH SCHEME

145. Plaintiff restates and incorporates the preceding paragraphs as though set forth here word for word.

146. Defendant Carvana knowingly, willfully and intentionally avoided providing actual or constructive notice of an aribitration agreement buried in their Terms of Use during online

45

Case 1:21-cv-00714-CCE-LPA   Document 27-1   Filed 11/03/21   Page 45 of 49

account creation in order to use that arbitration clause in a bait-and-switch scheme if necessary.

147.   Carvana intentionally designed their account creation process and subsequent arbitration agreements to serve a bait-and-switch scheme where they would give consumers an opt out opportunity in a written arbitration that was signed with actual notice but then switch to to a backup arbitration agreement if a consumer like the Plaintiff opted out of the signed agreement.

148.   Carvana's action or inactions were intended to deceive and did deceive the Plaintiff into believing that he had opted out of all arbitration agreements with Carvana. Carvana unfairly benefited from their deception by virtue of the profits gained due to Plaintiff's purchase which would not have occurred if Plaintiff were reasonably on notice of material information they concealed.

149.   As a result of Carvana's knowing, willful and intentional actions or inactions, Carvana is liable to the Plaintiff for compensatory and punitive damages to be determined by a jury.

## JURY TRIAL DEMAND

150.   Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays to this Honorable Court for the following relief:

a.   That this Court, assuming that Carvana has filed a Motion to Compel Arbitration or noted a defense based on their terms of service in a responsive pleading, enter a judgement finding (1) the Plaintiff did not agree to the Carvana's Terms of Use; (2) Plaintiff's claims are not subject to arbitration with Carvana; and (3) that Carvana's backup arbitration agreement is unconscionable.

46

b.  That the costs of this action be taxed to Carvana and Experian jointly and severally;

c.  That all triable issues in this complaint be determined by a jury;

d.  That judgment be entered for COUNT 1 against Carvana for statutory damages in an amount not less than $100 and not more than $1,000 for each separate willful violation of 15 U.S.C. § 1681b(f)(1)  pursuant to 15 U.S.C. § 1681n(a) and for punitive damages regarding each separate willful violation of 15 U.S.C. § 1681b(f)(1) and costs pursuant to 15 U.S.C. § 1681n(a)(2) and 15 U.S.C. § 1681n(a)(3);

e.  That judgment be entered for COUNT 2 against Carvana for statutory damages in an amount not less than $100 and not more than $1,000 for each separate willful violation of 15 U.S.C. § 1681b(f)(2) pursuant to 15 U.S.C. § 1681n(a) and for punitive damages regarding each separate willful violation of 15 U.S.C. § 1681b(f)(2) and costs pursuant to 15 U.S.C. § 1681n(a)(2)-(3);

f.  That judgment be entered for COUNT 3 against Carvana for compensatory and punitive damages for each separate instance in which they violated Plaintiff's right to privacy;

g.  That judgment be entered for COUNT 4 and COUNT 11 against Carvana for compensatory and punitive punitive damages for fraud;

a.  That the Court enter judgment for COUNT 5, finding that the Carvana violated N.C.G.S. § 75-1.1 as a matter of law and upon the Court's finding for the Plaintiff, compensatory damages be trebled pursuant to N.C.G.S. § 75-16.

b.  That judgment be entered for COUNT 6 against Experian for statutory damages in an amount not less than $100 and not more than $1,000 for each separate willful violation of 15 U.S.C. § 1681e(a) pursuant to 15 U.S.C. § 1681n(a) and for punitive damages regarding each separate willful violation of 15 U.S.C. § 1681e(a) pursuant to 15 U.S.C. § 1681n(a)(2) and costs pursuant to 15 U.S.C. § 1681n(a)(3);

47

c. That judgment be entered for COUNT 7 against Experian for statutory damages in an amount not less than $100 and not more than $1,000 for each separate willful violation of 15 U.S.C. § 1681b(c)(1) pursuant to 15 U.S.C. § 1681n(a) and for punitive damages regarding each separate willful violation of 15 U.S.C. § 1681b(c)(1) pursuant to 15 U.S.C. § 1681n(a)(2) and costs pursuant to 15 U.S.C. § 1681n(a)(3);

d. That judgment be entered for COUNT 8 against Experian for statutory damages in an amount not less than $100 and not more than $1,000 for each separate willful violation of 15 U.S.C. § 1681b(a)(2) pursuant to 15 U.S.C. § 1681n(a) and for punitive damages regarding each separate willful violation of 15 U.S.C. § 1681b(a)(2) pursuant to 15 U.S.C. § 1681n(a)(2) and costs pursuant to 15 U.S.C. § 1681n(a)(3);

e. That judgment be entered for COUNT 9 against Experian for statutory damages in an amount not less than $100 and not more than $1,000 for each separate willful violation of 15 U.S.C. § 1681g pursuant to 15 U.S.C. § 1681n(a) and for punitive damages regarding each separate willful violation of 15 U.S.C. § 1681g pursuant to 15 U.S.C. § 1681n(a)(2) and costs pursuant to 15 U.S.C. § 1681n(a)(3);

f. That judgment be entered for COUNT 10 against Experian for statutory damages in an amount not less than $100 and not more than $1,000 for each separate willful violation of 15 U.S.C. § 1681b(e) pursuant to 15 U.S.C. § 1681n(a) and for punitive damages regarding each separate willful violation of 15 U.S.C. § 1681b(e) pursuant to 15 U.S.C. § 1681n(a)(2) and costs pursuant to 15 U.S.C. § 1681n(a)(3);

g. That this Court award pre and post judgement interest for damages as the law may allow.

h. That this Court award such other relief as the Court deems appropriate and equitable.

Submitted this the _____ day of _____, _____.

_____
Arthur Hill
2849 Trestle CT SW
Concord, NC 28025
Phone: 980.521.1819
Email: artbhill@hotmail.com